**FILED**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

JAN 2 6 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

DARRYL JAMES McGLAMRY, *F141010579*
F.C.I.-ELKTON
P.O.B 10 Petitioner,
LISBON, OHIO 44432
-vs-

HARLEY G. LAPPIN,
BUREAU OF PRISONS,

            Respondent.

CASE NUMBER 1:06CV00143

JUDGE: Gladys Kessler

DECK TYPE: Habeas Corpus/2255

DATE STAMP: 01/**/2006

### PETITION FOR WRIT OF HABEAS CORPUS
### AND/OR DECLARATORY JUDGMENT WITH
### INCORPORATED MEMORANDUM OF LAW

COMES NOW the Petitioner, **DARRYL JAMES McGLAMRY**, in propria

personam, sui juris, acting as his own counsel, and files this

his Petition for Writ of Habeas Corpus and/or Declaratory Judgment

with Incorporated Memorandum of Law. In support of which he

states as follows:

### I. JURISDICTION

1. This is an action to set aside and agency action pursuant

to the Administrative Procedure Act, Title 5 U.S.C. §701-706.

This Court has jurisdiction pursuant to Title 28 U.S.C. §§2201

and 2241. Petitioner also invokes this Court's jurisdiction

pursuant to Title 28 U.S.C. §§1331 and 1346(a)(2).

### II. PARTIES

2. Petitioner, Darryl James McGlamry, is an inmate in the

custody of the Bureau of Prisons incarcerated at the Federal

-1-

Correctional Institution in Elkton, Ohio.

3. Respondent, Harley G. Lappin, is the Director of the Bureau of Prisons which is a component of the Department of Justice, an executive department of the United States of America.

## III. STATEMENT OF THE CASE

4. On June 11, 2002, Petitioner, while incarcerated at the Federal Correctional Institution in Jesup, Georgia, was written an incident report alleging a violation of Code 408 - Conducting a Business. (Ex. A).

5. On June 13, 2003, a disciplinary hearing was held by Discipline Hearing Officer Scott Schleder. At the hearing the Petitioner was found guilty of the alleged violation and sanctions were imposed. (Ex. B).

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. On August 13, 2002, the Petitioner filed a Regional Administrative Remedy Appeal (BP-10) challenging the findings and sanctions imposed at the discipline hearing. (#277735)

7. By response dated October 11, 2002, the Regional Director denied the Petitioner's BP-10.

8. On November 4, 2002, the Petitioner filed a Central Office Administrative Appeal (BP-11) challenging the denial of his BP-10. (No. 277735-A1)

9. By response dated January 15, 2003, the Administrator for National Inmate appeals denied the Petitioner's BP-11.

10. This petition follows.

-2-

## STATEMENT OF THE FACTS

On December 10, 2001, the Petitioner, an inmate at FCI Jesup, was placed in Administrative Detention (A/D) by SIS Lt. Bryan Ruley, pending an investigation in to staff misconduct. During an interview with the Petitioner, Lt. Ruley relayed an offer to the Petitioner from Captain Anthony S. Chamness. Captain Chamness stated that if Petitioner would cooperate with the SIS investigation in to staff misconduct Petitioner would receive a warded-to-warden transfer to the Low Custody Correctional Institution in Coleman, Florida (Coleman-Low). Since Captain Chamness had already stated his intention to transfer Petitioner regardless of the outcome of the investigation, Petitioner acquiesced and agreed to cooperate with the SIS investigation.

During a subsequent debriefing by Special Investigative Agent (SIA) Johnny L. Price, it became apparent to the Petitioner that in order to document his allegations of staff misconduct he would have to disclose to the SIS staff the existence of computer files that he had secreted within the UNICOR computer system. Because these files also documented the Petitioner's previously undisclosed financial relationship with a UNICOR vendor, Petitioner could not disclose the existence of these files without disclosing his relationship with the vendor.

To protect himself from any adverse action, the Petitioner told SIA Price that he could direct him to secreted computer files that would document staff misconduct, but that he could not do so unless SIA Price guaranteed Petitioner that the data, once disclosed, would not be used as the basis for a disciplinary

-3-

action against the Petitioner. At that time SIA Price agreed to these conditions. The Petitioner then provided SIA Price with the file path where the files were hidden and gave him instructions on how to retrieve the files. The files were subsequently retrieved by the systems analyst and forwarded to SIA Price.

Upon review of the files SIA Price discovered the Petitioner's undisclosed financial relationship with the UNICOR vendor. At that time the SIS investigation in to staff misconduct was suspended and the Federal Bureau of Investigation (FBI) was contacted.

On February 10, 2002, the Petitioner was interviewed by FBI Special Agent Anthony Alig regarding Petitioner's relationship with the UNICOR vendor American Procurement, Inc. At that time the Petitioner explained his association with the vendor and stated that there had not been any illegal activity. Petitioner stated he had simply advised a third party of the possibility of winning government purchase orders if he could locate a vendor for the various products. Subsequent investigation of these facts proved true and the FBI closed its investigation after concluding that there was no evidence of a federal criminal violation.

Upon the conclusion of the FBI investigation, the SIS staff resumed their investigation in to staff misconduct. On March 4, 2002, SIS Lt. Ruley, after conducting several interviews with the Petitioner, requested that the Petitioner execute an affidavit stating that he had created various secret files at the direction

-4-

of various UNICOR staff. The Petitioner executed the affidavit as requested.

On April 26, 2002, Warden Danny L. Hobbs submitted a letter to the Southeast Regional Office (SERO) Correctional Services Administrator requesting that the Petitioner be transferred from FCI Jesup based on his cooperation in an SIS investigation in to staff misconduct. On May 14, 2002, the Petitioner was advised by SIA Price that he had been designated for transfer to FCI Talladega.

Distraught over the fact that the administration had reneged on its promise to transfer him to Coleman-Low the Petitioner wrote a letter to a local newspaper reporter documenting the allegations of staff misconduct and corruption. The following day (May 15, 2002) the Petitioner was written an Incident Report by SIS Lt. Ruley. The I/R utilized information and data that the Petitioner had provided during the SIS investigation in to staff misconduct. The Petitioner was subsequently found guilty by the DHO of Conducting a Business and sanctions were imposed.

Petitioner sought review of the DHO's findings and sanctions through the administrative remedy process. All the Petitioner's appeals were denied. Petitioner has exhausted all available administrative remedies.

This petition follows.

## ISSUE I

## VIOLATION OF COOPERATION AND IMMUNITY AGREEMENT

On December 10, 2001, Petitioner was placed in Administrative Detention (A/D) by Special Investigative Section (SIS) staff and an investigation initiated in to staff misconduct at the prison's UNICOR factory. The action was precipiated by staff's discovery of a traffic ticket issued to a staff member's son in the Petitioner's personal property. Petitioner was subsequently induced in to cooperating with the investigation by a promise of a transfer to FCC Coleman-Low and administrative immunity.

At the outset of the investigation SIA Price asked Petitioner if he could document his allegations that he had performed legal work for Mr. Pasley regarding his son's traffic citation. Petitioner advised Mr. Price that he could provide the location of computer files secreted within the UNICOR computer system which would document the allegations.

Petitioner knew that disclosure of these would also reveal that he had an undisclosed relationship with a UNICOR vendor. A relationship that, if disclosed, might result in a disciplinary action against him. To protect himself from any adverse consequences the Petitioner advised SIA Price that he could not disclose the location of the secreted files unless SIA Price guaranteed that the data contained in those files, once disclosed, would not be used against Petitioner for purposes of a disciplinary action. SIA Price agreed to those terms.

-6-

Based on SIA Prices's oral agreement of blanket immunity to any administrative action the Petitioner disclosed the location of the secreted files. The files were retrieved and SIA Price discovered the Petitioner's financial relationship with the UNICOR vendor. At that time the SIS investigation in to staff misconduct was suspended and the FBI was contacted in order to investigate the Petitioner's relationship with the UNICOR vendor.

After the FBI completed its investigation AUSA Jeffrey J. Buerstatte determined that there was no evidence of a criminal violation and declined to pursue an indictment. At that point the SIS staff resumed their investigation in to staff misconduct. In accordance with the cooperation agreement the Petitioner executed an affidavit documenting staff misconduct.

The Petitioner was subsequently advised by SIA Price that he had been designated for transfer to FCI Talladega, not to FCC Coleman-Low as he had been promised. Distraught over the administration's violation of the cooperation agreement the Petitioner wrote a letter to a local newspaper reporter whom he had previously provided information that resulted in a series of front pages articles that embarrassed the administration. (Ex. C). In his letter the Petitioner detailed the SIS investigation in to staff misconduct and corruption.

The following day the Petitioner was written an Incident Report by SIS Lt. Bryan Ruley. The Incident Report utilized information and data the Petitioner had disclosed during the

-7-

SIS investigation in to staff misconduct. The Incident Report

was processed over Petitioner's objections that it violated

the Immunity Agreement. Petitioner was subsequently found guilty

of Conducting a Business based on his financial relationship

with the UNICOR vendor that was disclosed as a direct result

of his cooperation with the SIS investigation.

Petitioner submits that as a matter of fair conduct the

government is required to honor an agreement of blanket

administrative immunity when the record shows: (a) that the

agreement was made; (b) that the Defendant performed on his

side; (c) that the subsequent proceeding is directly related

to the offenses in which the defendant, pursuant to the agreement,

assisted with the investigation of. Rowe v. Griffin, 676 F.2d

524 (11th Cir. 1982). The government's violation of this

agreement constitutes arbitrary and capricious conduct.

At the Diciplinary Hearing the Petitioner called SIA Price

as a witness. At that time SIA Price admitted that the Petitioner

was promised a transfer to FCC Coleman-Low in return for his

cooperation in the SIS investigation. SIA Price further testified

that he and Captain Chamness did tell the Petitioner that the

information that he was providing would not be used against

him in any disciplinary action. Finally, SIA Price confirmed

that the Petitioner had cooperated fully with the FBI and SIS

investigations. (Ex. B)

Petitioner submits that he has made a prima facie showing

that the prosecution of Incident Report in the instant action

-8-

was taken in bad faith and in violation of the Immunity Agreement.

Based on the foregoing the Petitioner submits that he is

entitled to specific performance under the cooperation agreement

which requires that the Incident Report be expunged and that

the Petitioner be transferred to a facility commensurate with

his current scored security level of Minimum. It should be noted

that Petitioner is currently being held in a Low security level

institution even though he qualifies for camp placement at

Minimum security. The Respondent's stated cause for this action

is the Incident Report at issue in this proceeding. Petitioner

would also note that he is in excess 1,200 miles from his release

residence of Fort Lauderdale, Florida. BOP policy is to designate

inmates to facilities within 500 miles of their release destimation.

Due to the fact that the instant Incident Report appears in

his inmate Central File the Petitioner has been repeatedly subjected

to adverse actions regarding his programming.

## ISSUE II

### THE BOP's FAILURE TO FOLLOW ITS OWN REGULATIONS CONSTITUTES ARBITRARY AND CAPRICIOUS CONDUCT

An inmate is entitled to expect the Bureau of Prisons to

follow its own policies. <u>Wolff v. McDonnell</u>, 418 U.S. 539, 557,

141 L.Ed.2d 935, 94 S.Ct. 2963, 2975 (1974). The failure of

an agency to follow its own regulations constitutes arbitrary

and capricious conduct. Furthermore, an agency must scrupulously

observe rules, regulation or procedures which it has established.

When it fails to do so its action cannot stand and the courts

will strike it down. U.S. v. Heffner, 420 F.2d 809 (4th Cir. 1970)(citing ex rel Accardi v. Shaughnessy, 347 U.S. 260, 88 L.Ed. 681, 74 S.Ct. 499 (1954).

Title 18 U.S.C. §4042 sets forth the "Duties of Bureau of Prisons" which states in pertinent part:

(a) In general - The Bureau of Prisons, under the direction of the Attorney General, shall-

(3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise:

In accordance with this mandate the BOP has promulgated Title 28 CFR §541.10 - §541.23 and Program Statement 5270.07 entitled "Inmate Discipline and Special Housing Units".

**A. Time Limit Violation:**

BOP program statement 5270.07 requires that an Incident Report ordinarily be written with 24 hours of staff becoming aware of the incident. In the instant case staff became aware of the incident in January of 2002. The Incident Report was not written until May 15, 2002, some three and a half months later. Petitioner submits that absent a showing of good cause, the time limitation violation acts as a administrative statute of limitations barring the administrative disciplinary action.

Petitioner raised this objection with the Discipline Hearing Officer (DHO) at the discipline hearing. The DHO overruled Petitioner's objection concluding that "Lt. Ruley proceeded with disciplinary action when he gathered the appropriate information to charge you in the case." This conclusion is

-10-

erroneous.

On January 31, 2002, SIA Price contacted the FBI and requested an investigation in to Petitioner's relationship with a UNICOR vendor. On February 10, 2002, Petitioner was interviewed by SIA Price and FBI Agent Alex Alig. During the interview the Petitioner gave a detailed account of his conduct and the relationship to the UNICOR vendor. Subsequent investigation by the FBI revealed that no criminal conduct had occurred. Based on this the FBI case was closed.

The SIS staff subsequently resumed their investigation in to staff misconduct and as previously agreed Petitioner assisted in the investigation. It was almost a full month later that the request for Petitioner's transfer was submitted. Over two full months later the Petitioner learned that the BOP staff had reneged on the cooperation agreement and had him designated to Talladega, Alabama instead of Coleman-Low. Petitioner still had not been written an Incident Report.

On May 14, 2002, the Petitioner learned that BOP staff had reneged on the cooperation agreement and that he was not being transferred to FCC Coleman-Low but was being given a disciplinary transfer to Talladega, Alabama. An institution over 800 miles from his family. It was then that Petitioner submitted a letter for mailing to a local newspaper reporter documenting the SIS investigation in to staff misconduct and corruption. (All mail at the facility must be submitted unsealed to allow staff to review it) The following day the incident

-11-

report was written.

At the DHO hearing the Petitioner objected to the proceeding based on the fact that staff had been aware of the alleged violation for several months and had not written the incident report in accordance with policy. The DHO attempted to excuse the time violation by asserting that the investigation was still in process. This is blatantly false.

The SIS staff did not clear the Petitioner for transfer until his cooperation was complete. At that point SIS staff no longer needed Petitioner's assistance and the transfer request was processed. SIS staff did not develop any further information regarding Petitioner from that point forward. Policy requires that staff write the incident report within 24 hours of becoming aware of the prohibited conduct. If necessary, the process is to be suspended pending investigation. It is obvious why this was not done in the instant case.

If the SIS staff had written the Petitioner an incident report at that point in time, in violation of the cooperation and Immunity agreement, it is obvious that they would have not gotten the benefit of the Petitioner's cooperation in their investigation in to staff misconduct. The SIS staff made the Petitioner promises to induce his cooperation, then once they had gotten the benefit of their agreement they broke it.

The Petitioner submits that where there is no good cause shown for violating the time limitation except to allow staff to gain the benefit of the Petitioner's cooperation then to

-12-

deny him the benefit of the promises made to induce his cooperation, that the Petitioner is entitled to specific performance of the contractual agreement. Based on the foregoing the incident report should be expunged and the Petitioner given a transfer to a facility commensurate with his scored security level (Minimum) and within 500 miles of his release destination.

**B. Denial of Opportunity to be Heard:**

Prior to the DHO hearing the Petitioner notified the Unit Disciplinary Committee that he was requesting the written statement of Mr. Randy Russo. At the outset of the DHO hearing the Petitioner requested that the hearing be postponed until he could obtain the witness statement of Mr. Russo. Mr. Russo was the third party who actually operated the business known as American Procurement, Inc. The business Petitioner was charged with conducting in the instant action.

Mr. Russo was interviewed by SIA Price and FBI Agent Alig. SIA Price's memorandum in support of the incident report attributed various statements to Mr. Russo which Mr. Russo denied making when he spoke to the Petitioner telephonically. In order to controvert these statements the Petitioner sought to postpone the hearing in order to obtain the written statement of Mr. Russo. The DHO refused to continue the hearing, concluding that "any statement [Petitioner] might receive from Mr. Russo now could be manipulated by [Petitioner], and tainted by [Petitioner's] influence." (Ex. B, p. 5)

The DHO's basis for denying the requested witness statement

-13-

is invalid. The DHO's argument goes to the credibility of the witness, not the Petitioner's administrative Due Process right to call the witness.

Title  28 CFR §541.17 states as follows:

Procedures before the Discipline Hearing Officer:

The Discipline Hearing Officer shall proceed as follows:

C. "...An inmate has the right to submit names of requested witnesses and have them called to testify and to present documents in the inmate's behalf...

"The DHO shall call those witnesses who have information directly relevant to the charge(s) and who are reasonably available. This may include witnesses from outside the institution."

"The DHO shall request submission of written statements from unavilable witnesses who have information directly relevant to the charge(s).

Program Statement 5270.07, Chapter 7, Pg. 4, states in pertinent part:

"On occasion, an inmate may request a witness who is not reasonably available to testify in person (e.g., an inmate from another institution). When this occurs, the DHO will ordinarily allow sufficient time for the written statement of the witness(es) to be received, if that witness is indicated to have relevant information. If an extension is not granted, the DHO shall clearly state in the record of the hearing the reasons for not granting the delay."

The DHO in the instant case blatantly disregarded the mandatory language of the regulation and program statement. The DHO had the right to discount the witness statement as not being credible once it was received, but he could not refuse to allow Petitioner to call the witness.

Based on the DHO's violation of the regulation and the Program statement a new hearing is required to be held.

### C. Loss of Job Sanction:

Program Statement 5270.07, Chapter 4, page 21, ¶j, states:

"The DHO or UDC may direct that an inmate be removed from **present job** and/or be assigned to another job." (emphasis added). (See exhibit D).

On December 10, 2001, when the Petitioner was placed in Administrative Detention he was assigned to "Pipefitting". (Ex. E) As such, Petitioner's **present job** was the only job that the DHO could remove the Petitioner from.

As part of the sanctions imposed on Petitioner, the DHO entered a sanction of "Loss of job in Unicor for remainder of Sentence. No employment with Unicor allowed in any fashion." (Ex. F) The DHO also submitted a Memorandum for inclusion in the Petitioner's Central file. (Ex. G).

Petitioner submits that this sanction was clearly not allowed under the language of the program statement. Based on the fact that this sanction was not available it was arbitrary and capricious for the DHO to impose in violation of the regulation. As such, it should be vacated.

### D. Loss of Telephone Privilege:

Program Statement 5270.07, Chapter 4, page 20, ¶g, states in pertinent part:

"Ordinarily, loss of privileges is used as a sanction in response to an abuse of that privilege. However, the DHO or UDC may impose a loss of privilege sanction not directly related to the offense where there is a lack of other appropriate sanctions or where imposition of an appropriate sanction has proven ineffective."

Since this is the first time that the Petitioner has ever

been written an incident report he has never been sanctioned before. As such, it cannot be said that "imposition of an appropriate sanction has proven ineffective." As such, the only basis for imposing the loss of telephone privilege sanction would be "the lack of other appropriate sanctions."

In the instant action the DHO did not allege that other available sanctions were inappropriate. Instead he tries to justify the sanction through some specious claim about effecting the Petitioner's "future choices in communicating...". Petitioner submits that the DHO's imposition of the loss of telephone sanction was unsupported by the requisite showing and should be held invalid. (Petitioner notes that he has already suffered the burden of this sanction but seeks a judicial determination that the DHO violated the policy. Ex. H).

**WHEREFORE**, the Petitioner respectfully request that this Honorable Court grant the instant petition and order the Respondent to:

a. Expunge incident report #992221 and all related documents from the Petitioner's inmate Central file;

b. Transfer the Petitioner to a facility within 500 miles of his release destination of Fort Lauderdale, Florida, and commensurate with his scored security level of Minimum custody.

Respectfully submitted,

Darryl McGlamry

BP-S288.052 INCIDENT REPORT (CDFRM)
MAY 1994
U.S. DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

| 1. Name of Institution | FCI/FSL/FCP Jesup, GA. | Incident Report Number | 992221 |
|---|---|---|---|

Part I - Incident Report

| 2. Name of Inmate | 3. Register Number | 4. Date of Incident | 5. Time |
|---|---|---|---|
| McGlamry, Darryl | 14101-057 | Between 04-15-2000 and 02-21-2001 | approximate ly 0830 |

| 6. Place of Incident | 7. Assignment | 8. Unit |
|---|---|---|
| UNICOR | Unassign. | C Unit |

| 9. Incident Conducting a business | 10. Code | 408 |
|---|---|---|

| 11. Description of Incident Date: | 05-15-02 | Time: | 1200 | Staff became aware of incident |
|---|---|---|---|---|

While assigned to the UNICOR factory, between the dates of 04-15-2000, and 02-21-2001, inmate McGlamry provided information to a company named American Procurement. McGlamry told a person named Randy Russo how to set up the company American Procurement, and advised him on what vendors to buy product from, which was to be resold to UNICOR. McGlamry also gave Mr. Russo instructions and advice about running the business. UNICOR purchased thousands of dollars worth of products from American Procurement, and a portion of the profits were split with McGlamry. Inmate McGlamry assisted and directed Mr. Russo in the operation of this company, which profited off business from UNICOR. McGlamry worked for UNICOR as an inmate assigned to a work detail, and used his knowledge, and access, to advise American Procurement of the lowest bid. With this information, American Procurement could place the lowest bid. His direct connection to American Procurement was unknown to staff until it was uncovered during an investigation.

This incident report was rewritten to changed the charge against the inmate, to correct the date of the incident, and to give the inmate more specific notice of the charge against him.

06-0143

FILED

JAN 2 6 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| 12. Signature of Reporting Employee | Date and Time | 13. Name and Title (Printed) |
|---|---|---|
| | 6/11/02 330/p | B. Ruby, LT |

| 14. Incident Report Delivered to Above Inmate By | 15. Date Delivered | 16. Time Delivered |
|---|---|---|
| R Mawl | 6-11-02 | 1930 |

Ex. A

PART III - Committee Action

17. Comments Of The Inmate To The UDC Regarding The Committee Regarding The Above Incident

I'm glad that Mr. Russo conducted the business get him

| 18. | | | ☒ | The Committee Is Referring The Charge(s) To The DHO For |
|-----|--|--|--|-----|
| — | Committed The Following Prohibited Act(s) | | | |
| — | Did Not Commit A Prohibited Act | | | |
| | | | — | The Committee Advised the Inmate Of Its Finding And Of The Right To File An Appeal Within 15 Calendar Days |

19. Committee Decision Is Based On The Following Information

Due to the nature of the incident, the UDC is Referring to the DHO.

20. Committee action and/or recommendation is referred to DHO (Contingent upon DHO finding inmate committed the prohibited act):

Sanctions to be determined by the DHO

21. Date And Time Of Action    6/10/02    155 p     (The UDC Chairman's Signature Next To His Name Certifies Who Sat On The UDC And That The Completed Report Accurately Reflects The UDC Proceedings.)

| Chairman (Typed Name/Signature) | Member (Typed Name) | Member (Typed Name) |
|-----|-----|-----|
| DMorley | Cae  Lt Vice | |

Part III Investigation

| Investigative Period | 6-11-02 | | 1930 | |

Inmate Advised of Right to Remain Silent. You Are Advised of Your Right to Remain Silent At Any Stage Of The Disciplinary Process. You Are Not Required That Your Silence May Be Used To Draw An Adverse Inference Against You At Any Stage Of The Institutional Disciplinary Process. You Are Also Advised That Your Silence Alone May Not Be Used To Support A Finding That You Have Committed A Prohibited Act.

| The Inmate Was Advised Of The Above At Time | | Initials | |
| R. MAULDIN | | 6-11-02, 1930 | |

24. Inmate Statement And Attitude

INMATE MCGLAMRY WAS ADVISED OF HIS RIGHT TO REMAIN SILENT AND HE CHOSE TO EXERCISE HIS RIGHT BY MAKING THE STATEMENT, "I WILL RESERVE THE RIGHT TO MY SILENCE PENDING UDC OR DHO."

25. Other Facts About The Incident, Statements Of Those Persons Present At Scene, Disposition Of Evidence, Etc.

SEE ATTACHED AMERICAN PROCUREMENT, INC. INVOICE # 500, 501, AND 502, MEMORANDUM FROM SIA PRICE CONCERNING HIS INTERVIEW WITH MR. AND MRS. RANDY RUSSO.

26. Investigator's Comments And Conclusions

BASED UPON THE BODY OF THE REPORT WHERE INMATE MCGLAMRY PROVIDED INFORMATION TO A COMPANY NAMED AMERICAN PROCUREMENT, UNICOR PURCHASING THOUSANDS OF DOLLARS WORTH OF SUPPLIES FROM AMERICAN PROCUREMENT, MR. RUSSO STATING HE HAD MADE A GREAT DEAL OF MONEY VIA AMERICAN PROCUREMENT AND HAD SPLIT THE PROFITS WITH INMATE MCGLAMRY, INMATE MCGLAMRY RELUCTANCE TO PROVIDE A STATEMENT ON HIS BEHALF TO THIS INVESTIGATIVE LIEUTENANT, THIS INVESTIGATOR CONCURS INMATE MCGLAMRY WAS PROPERLY CHARGED WITH CODE 408, RUNNING A BUSINESS.

27. Action Taken

THIS INCIDENT REPORT IS BEING FORWARDED TO THE UDC FOR FURTHER DISPOSITION.

| Date And Time Investigation Completed | 06-11-02, 1936 |
| Printed Name Of Investigator | R. MAULDIN |
| *R. Mauldin (signature)* | E/W OPERATIONS LIEUTENANT |
| Signature | Title |

**DISCIPLINE HEARING OFFICER REPORT**
**U.S. DEPARTMENT OF JUSTICE**

**BP-S305.052 MAY 94**
**FEDERAL BUREAU OF PRISONS**

| INSTITUTION | FCI/FSL/SCP  Jesup, Ga. | INCIDENT REPORT NUMBER | | 992221 |
|---|---|---|---|---|
| INMATE NAME | McGlamry, Darryl | REG NO | 14101-057 | UNIT | C Unit |

| DATE OF INCIDENT | Between 04-15-2000 and 02-21-2001 | DATE OF INCIDENT REPORT | 06-11-2002 |
|---|---|---|---|

| OFFENSE CODE(S) | 408 |
|---|---|
| SUMMARY OF CHARGES | Conducting a Business |

**I.  NOTICE OF CHARGE(S)**

A. Advanced written notice of charge (copy of Incident Report) was given to inmate on
(date)   06-11-2002      at (time)   1930      (by staff member)  R. Mauldin, Lieutenant

B. The DHO Hearing was held on (date).   06-13-2002    at (time)    1413

C. The inmate was advised of his/her rights before the DHO by (staff member):

D. Moseley, Counselor               on (date)      06-12-2002           and a copy
of the advisement of rights form is attached.

**II.  STAFF REPRESENTATIVE**

| A. Inmate waived right to staff representative. | Yes: | | No: | XX |
|---|---|---|---|---|

B. Inmate requested staff representative and  R. Courson, Case Manager       appeared.

C. Requested staff representative declined or could not appear but inmate was advised of
option to postpone hearing to obtain another staff representative with the result
that:

| D. Staff representative | | was appointed. |
|---|---|---|

**III.  PRESENTATION OF EVIDENCE**

| A. Inmate admits | | denies | X | the charge(s). |
|---|---|---|---|---|

B. Summary of inmate statement:

You appeared at this hearing along with your requested staff representative.  You stated
you and your representative reviewed this case and were ready to proceed at this time.
You stated you understood your rights before the DHO, and you had received your copy of
the incident report.

When you were given an opportunity to make you presented a written statement, gave a
verbal statement, and submitted a list of written questions for Mr. Price, who was a
witness.

Your written statement is summarized as follows:

You stated you never instructed Mr. Russo on how to set-up the company (American
Procurement).  You stated that company was formed by Gordon Edgcomb in 1999.  You
stated that between the specified dates of 04-15-2000 and 02-21-2001, you did not
provide American Procurement with any information because the company was fully
functional and did not require any information.  You stated you did not advise Mr.
Russo on what vendors to buy product from, but you did advise him that you thought
he could locate vendors by using the Internet.  You stated you never gave Mr. Russo

**06 0143**

**FILED**

JAN 2 6 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Ex. B

**DISCIPLINE HEARING OFFICER REPORT**
**U.S. DEPARTMENT OF JUSTICE**

BP-S305.052 MAY 94
**FEDERAL BUREAU OF PRISONS**

instructions, but when asked you did provide him with your personal opinions. You stated you never assisted or directed Mr. Russo in the operation of the company, but when asked you gave him your personal opinions. You stated that the only information you provided to Mr. Russo, or American Procurement, was information which was available as Public Records. You stated these would have been on closed procurements, and you never provided any information on any procurement in open competitive bid process. You stated that you routinely provided this type of information to any an all vendors, as part of your work assignment as Factory Manager Clerk.

You stated the writing of this incident report was delayed, when staff actually became aware of this case in January of 2002. You claimed there was not good cause for the delay in the issuing of the charge. You stated this incident report was written in retaliation against you because you mailed out letters to media contacts which would expose alleged staff misconduct. You stated you assisted staff in an investigation, by providing the location of the information which would assist them in an investigation against a staff member, and you had been assured by Mr. Price that none of the data they retrieved would be used against you for any administrative disciplinary action. You stated the information used to generate this charge should not be used against you.

You stated the evidence does not support a charge of Conducting a Business, as the memorandums submitted by Lt. Ruley, and Mr. Price do not properly characterize the association between you, Mr. Russo and American Procurement. You stated that when Gordon Edgecomb incorporated the company American Procurement, he was unable to obtain financing. You stated you urged Mr. Russo to take over the company and operate the venture because you felt it would be profitable for him. You stated Mr. Russo came to visit you (in prison) and you and he discussed that matter. You stated you gave Mr. Russo personal advise on the matter. You stated you and Mr. Russo were friends of long standing. You stated Mr. Russo owned a Restaurant at the time this took place, and you routinely gave Mr. Russo personal advise on matters relating to his Restaurant. You stated you also gave Mr. Russo advise in Legal Matters which related to his business, finances, and his girl friend's post divorce matters. You stated the fact that you gave personal advice to Mr. Russo regarding business matters he conducted for American Procurement does not support a finding that you conducted a business. You stated that Russo opened the checking account for the company, he was the only signatory on the account, he obtained the business phone and answered this phone, he operated the company fax machine, he sent and received various documents for the business. You stated Russo was the one who received the Purchase Orders from UNICOR, he located the vendors for the goods, he order the goods, and when the goods were delivered to UNICOR he prepared the Invoices and the Certificates of Conformance. You stated Mr. Russo paid the bills with his personal credit cards, when UNICOR paid for the goods they received from him, Mr. Russo received the funds. You stated that this all shows that Mr. Russo was the person who ran American Procurement as a one-man-shop. You stated Mr. Russo split the profits with you because the initial idea for the business was yours. You stated you were never an officer of the corporation, and never participated in the day-to-day operation. You stated that you simply provided the initial idea, and gave personal advice to your friend, Mr. Russo.

You related how you have given advice to numerous people. You stated some of them took your advice, and some didn't. You stated you simply provided advice to Mr. Russo, who acted on your advice, and because it was profitable for him, he chose to split his profits with you. You made a comparison to giving information to someone, who makes a profit from your information, and decides to reward you for their good fortune. You stated Mr. Russo simply acted on your advice, which turned out to Mr. Russo's and your mutual benefit.

You stated you felt that the Warden had exerted undue influence on this action. You stated that although the Warden knew of your agreement with Mr. Price, that disciplinary

**DISCIPLINE HEARING OFFICER REPORT**
**U.S. DEPARTMENT OF JUSTICE**

BP-S305.052 MAY 94
**FEDERAL BUREAU OF PRISONS**

action would not be taken against you using the information you provided, he advised you that it was his policy to pursue action whenever a rule infraction was discovered. You stated the Warden influenced the UDC's decision to send this incident to the DHO because the UDC did not even deliberate the issue. You stated you have eight years of clear conduct, and an incident report this minor in severity is not normally referred to the DHO level. You stated that this incident report is retaliation against you because you received some money because you had good enough business sense to see a profitable situation, and you advised a friend to act upon it. You added that this, along with the fact that you had the temerity to divulge allegations of staff misconduct to your media contacts, shows that this is a retaliatory action.

As further written statement you submitted another written statement which you titled "Arguments in Mitigation of Sanctions" in case a finding was made against you. These arguments are as follows:

You stated you have maintained clear conduct throughout your eight years of incarceration. You stated you provided substantial assistance in numerous on-going FBI, OIA, and SIS investigations at this institution. You stated that despite being promised a transfer to Coleman-Low, you have been redesignated to FCI Talladega. You stated you have already spent twenty-seven (27) weeks in Administrative Detention. You stated that, as a result of this investigation, your privileges have been suspended for approximately forty-five (45) days. You pointed out that the transactions between American Procurement and UNICOR resulted in substantial savings to the government. You concluded that you felt the imposition of any additional sanctions would be disproportionate to the sanctions routinely imposed for an incident report in the Low Moderate Category of the disciplinary severity scale.

Along with the written statements already summarized above, you were also questioned during this hearing, to clarify statements during the hearing. These statements are summarized as follows:

You stated you wanted to get a written statement from Mr. Randy Russo for presentation in your behalf.

You stated the information you provided to Mr. Russo, at American Procurement, and any other vendor who requested that information, was the price which was awarded on the previous contracts. You stated you did not give information on any open contract, in which bidding was still taking place. You stated that you did receive money from Mr. Russo after each transaction by American Procurement with UNICOR. You stated you did create the invoices which were presented as evidence at this hearing, and which were used by American Procurement in their dealings with UNICOR.

R. Courson, Staff Representative - Mr. Courson advised that you did want time to receive a statement from Mr. Randy Russo, for presentation at this hearing. Mr. Courson stated he knew you when you were on his case load, and he always found you to be very cooperative with him, and any other staff you dealt with.

| C. Witness(es): | | | | | |
|---|---|---|---|---|---|
| 1. The inmate requested witness(es). | | Yes: | XX | No: | |

2. The following persons were called as witnesses at this hearing and appeared. (Include each witnesses' name, title, reg number and statement as appropriate.)

J. Price, Special Investigative Agent - Inmate McGlamry submitted a list of questions for Mr. Price. Some questions were answered by Mr. Price. Other questions were determined by the DHO, to not be significant to the charge, or have any bearing on any

**DISCIPLINE HEARING OFFICER REPORT**
**U.S. DEPARTMENT OF JUSTICE**

BP-S305.052 MAY 94
**FEDERAL BUREAU OF PRISONS**

decision which might be made in his case. Notes were taken by the DHO, during the hearing, on the paper these questions were written on, but these notes do not represent the entire answers by the witness, and were only to assist in the recall of what was stated during the hearing.

Mr. Price stated that you did provide a (computer) file address for documents which related to an allegation of misconduct by a staff member. Mr. Price stated he and the Captain did tell you that the information you were providing would not be used against you in disciplinary action, but he stated the information they were asking for concerned a possible staff misconduct. Mr. Price stated that at the time you were providing that information, he did not know anything about American Procurement, or your connection with that company. Mr. Price stated no staff members were aware of your connection to Mr. Russo and American Procurement when this interview took place.

Mr. Price stated he could not say for sure if your connection with American Procurement would have been discovered if you had not provided the information you did. Mr. Price stated you were subsequently interviewed by the FBI. He stated you did waive your right to counsel, and you did waive your right to remain silent. Mr. Price felt that you answered the FBI agent's questions honestly. Mr. Price stated that, at the conclusion of the FBI's investigation, it was determined you and Mr. Russo had not violated any Federal, State, or local statute.

Mr. Price stated that it is possible that if you had not cooperated, the investigations into staff misconduct, or this incident, would not have revealed the information which was discovered. However, Mr. Price did not rule out the possibility that staff could have found the information on their own. He stated they knew the information was there, but you just made it easier because you knew right were it was located. Mr. Price stated that it is possible that you would not have been charged in this incident if you had not assisted in the investigation, but that would only have been the case if staff had not been able to find the information on their own. Mr. Price stated that you were promised a transfer to Coleman-Low by the Captain, but this was at a time when they were only talking about staff issues, and was before your connection to American Procurement was discovered. Mr. Price felt you had been cooperative in his investigation, but had no opinion on why you were cooperative.

Mr. Price stated that both he and an FCI Special Agent interviewed Mr. And Mrs. Randy Russo. Mr. Price stated that Mr. Russo was the person who conducted the day-to-day operation of American Procurement. Mr. Price stated he did not know if you were listed as an officer of the corporation. Mr. Price stated he first became aware of your association with American Procurement when they found numerous documents in your (computer) directory on the "old" UNICOR computer program. Mr. Price stated he did not know the exact date that the FBI concluded their investigation into this incident. He stated it is an FBI file which he does not have access to at this time. Mr. Price also stated that because of other information found during, and relating to, this investigation, there are still active investigations into possible staff misconduct, which have not yet been concluded. Mr. Price stated that during this investigation your telephone and visiting privileges were suspended administratively.

Mr. Price was asked some additional questions by the DHO while at this hearing. His answers are summarized as follows:

Mr. Price stated the Invoices created by inmate McGlamry, were found stored by McGlamry on the "old" UNICOR "SYMIX" computer system. Mr. Price stated these Invoices, which were presented as evidence, along with numerous other documents were stored on McGlamry's personal directory. Mr. Price pointed out that these Invoices, which bill UNICOR for goods supplied, are the Invoices that American Procurement used to bill UNICOR.

DISCIPLINE HEARING OFFICER REPORT      BP-S305.052 MAY 94
U.S. DEPARTMENT OF JUSTICE      FEDERAL BUREAU OF PRISONS

| 3. The following persons requested were not called for the reason(s) given. |
|---|

It was noted that you requested the hearing be postponed pending a written statement from Mr. Randy Russo. The DHO determined that Mr. Price had already provided his summary of an interview he, and FBI Special Agent Alig, conducted with Mr. Russo concerning this incident. It was felt Mr. Price's recollection was clear and relevant to what you are being charge with in this case. It was also felt that the interview conducted by Mr. Price would be much more believable, and credible, as it was at the outset of the investigation into your dealings with American Procurement. It was felt than any statement you might receive from Mr. Russo now could be manipulated by you, and tainted by your influence. For these reasons the DHO denied your request for further statement from Mr. Russo.

| 4. Unavailable witnesses were requested to submit written statements and those statements received were considered. | Yes | | No | | N/A | X |
|---|---|---|---|---|---|---|

D. Documentary Evidence: In addition to the Incident Report and Investigation, the DHO considered the following documents:

Memorandum from Lt. B. Ruley, dated 05-15-2002

Memorandum from SIA J. Price, dated 06-04-2002

Invoice 00000500 from American Procurement Inc. to UNICOR FCI Jesup, dated 01-02-2001

Invoice 00000501 from American Procurement Inc. to UNICOR FCI Jesup, dated 01-31-2001

Invoice 00000502 from American Procurement Inc. to UNICOR FCI Jesup, dated 02-05-2001

Invoice 00000503 from American Procurement Inc. to UNICOR FCI Jesup, dated 02-06-2001

E. Confidential information was used by DHO in support of his findings, but was not revealed to the inmate. The confidential information was documented in a separate report. The confidential information has been (confidential informants have been) determined to be reliable because:

No confidential information was used in this finding.

**IV. FINDINGS OF THE DHO**

| X | A. The act(s) was/were committed as charged. |
|---|---|
| | B. The following act was committed: | |
| | C. No prohibited act was committed: Expunge according to Inmate Discipline PS. |

**V. SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS (Physical evidence, observations, written documents, etc.)**

It is the decision of the DHO that you committed the prohibited act of code 408, conducting a business. This decision is based on the statement of the reporting officer. Lt. B. Ruley stated that while you were assigned to the UNICOR factory, between the dates of 04-15-2000, and 02-21-2001, you provided information to a company named American Procurement. He stated you told a person named Randy Russo how to set up the company American Procurement, and advised him what vendors he should buy products from, and this product was then resold to UNICOR. Lt. Ruley stated that you also gave Mr. Russo instructions and advice about running the business. He stated that the UNICOR factory purchased thousands of dollars worth of products from American Procurement, and a portion of the profits for this company were split with you. He stated you assisted and directed Mr. Russo in the operation of this company, which profited off business from UNICOR. Lt. Ruley stated that you worked for UNICOR as an inmate assigned to a

DISCIPLINE HEARING OFFICER REPORT                           BP-S305.052 MAY 94
U.S. DEPARTMENT OF JUSTICE                                   FEDERAL BUREAU OF PRISONS

work detail, and used your knowledge, and access, to advise American Procurement of the
lowest bid. With this information, American Procurement could place the lowest bid. He
stated that your direct connection to American Procurement was unknown to staff until it
was uncovered during an investigation. Lt. Ruley stated that this incident report was
rewritten on 06-11-2002 to change the charge against you, to correct the date of the
incident, and to give the you more specific notice of the charge against you.

Supporting this decision is a memorandum from Lt. B. Ruley, dated 05-15-2002. In this
memorandum Lt. Ruley reports that this memorandum concerned an investigation into
misconduct by you while you were working on an inmate detail in the UNICOR Business
Office. Lt. Ruley stated that as a result of this investigation, numerous
investigations relating to possible staff misconduct had been initiated and referred to
the Federal Bureau Of Prisons - Office Of Internal Affairs, and are on-going at the
writing of this memorandum.

Lt. Ruley reported that you (Inmate McGlamry, #14101-057) were interviewed numerous
times during this investigation. He stated that during an interview with you on
03/04/2002, you stated you had provided information, by use of a "staff only" telephone
located in UNICOR (which you were approved to use by an Associate Warden), to a company
named American Procurement. Lt. Ruley stated you told him that American Procurement
then utilized this information to place the lowest bid on supplies ordered by UNICOR.
Lt. Ruley noted that UNICOR did receive supplies from American Procurement, and UNICOR
did submit payment to American Procurement for the supplies they had received. Lt.
Ruley stated you admitted to him that you received a commission from American
Procurement for providing the information. Lt. Ruley stated you also stated during this
interview, that you had typed, on your assigned "inmate access computer," one blank
Certificate Of Conformance for American Procurement to submit to UNICOR. This
Certificate Of Conformance was discovered in the inmate directory assigned to you in the
UNICOR computer system.

Lt. Ruley stated that you, through a direct connection with the company, were
compensated financially by a man named Randy Russo. He stated that interviews with Mr.
Russo revealed that Russo set-up American Procurement at your urging, and then you
actually directed Russo on the business operations of the company. Lt. Ruley concluded
that, in effect, you worked for UNICOR on an inmate detail, then used your knowledge,
and access, to set-up American Procurement, and used this company to profit on business
transactions you made as an inmate on a prison work detail.

Further supporting this decision is a memorandum from SIA J. Price, dated 06-04-2002.
Mr. Price reported that during the month of February 2002, he and Special Agent Tony
Alig, conducted an interview with Mr. And Mrs. Randy Russo, concerning their involvement
in a company named American Procurement. Mr. Price stated that the UNICOR (factory)
Department had been doing business with American Procurement for a period of time and
had purchased hundreds of thousands of dollars of products from the company. Mr.
Price stated that Mr. Russo told them that you had told him how to set-up the business,
and what vendors to buy products from to be resold to UNICOR. He reported that Mr.
Russo said he had visited you in FCI Jesup's Visiting Room and you and he had discussed
the details of the business. He stated Mr. Russo further told him that he had also
talked with you on the telephone, and had received instructions and advise from you
about running the business. Mr. Price stated that Mr. Russo said he had made a great
deal of money via American Procurement and had split the profits with you (Inmate
McGlamry).

Also supporting this decision are four (4) Invoices from American Procurement addressed
to the UNICOR (factory) at FCI Jesup, GA. The first Invoice is numbered 00000500. It
is dated 01-02-2001, and charges UNICOR in the amount of $428.23, and is a charge for
interest on a $21,911.50 balance which was more than 30 days old. The second Invoice is
numbered 00000501. It is dated 01-31-2001, and charges UNICOR in the amount of

DISCIPLINE HEARING OFFICER REPORT                                BP-S305.052 MAY 94
U.S. DEPARTMENT OF JUSTICE                                    FEDERAL BUREAU OF PRISONS

$8,568.00, and is a charge for 2,550 fiber board boxes which were supplied to UNICOR.
The third Invoice is numbered 00000502. It is dated 02-05-2001, and charges UNICOR in
the amount of $16,830.00, and is a charge for 4,950 fiber board boxes which were
supplied to UNICOR. The third Invoice is numbered 00000503. It is dated 02-06-2001,
and charges UNICOR in the amount of $16,009.85, and is a charge for 485,000 poly bags
which were supplied to UNICOR.

The DHO considered all statements and contentions to this charge against you. However,
it was found that the interview with Mr. Russo, the Invoices provided with this charge,
and your own statements, show that you were conducting a business. Business is a term
which applies broadly to all gainful activity. It is evident, at the level of greater
weight of evidence, that your conduct, while working as an inmate on a detail, was to
make gain from your activities associated with Mr. Russo, and the company, American
Procurement. Mr. Russo may have operated the business from the "outside," but it is
clear that it was necessary that a person do this for you, since there are numerous
things you could not do from "inside" prison. Just because Mr. Russo answered the
phones, wrote the checks, and received the payments, does not lessen the fact that he
became involved at your suggestion. He either took instruction, or advice from you, on
the operation of the business, and then gave you a portion of the profits. It was found
that your claims and explanations were just an attempt to cloud the truth with a lot of
fancy words. You gained financially from a situation which you had a hand in setting
up, and a situation which you could take advantage of because of the access you had been
given in the UNICOR factory. Inmates are not allowed to conduct business while in
Federal Prisons, as is referenced in Program Statement 5265.11. All information
indicates this was not an existing business which you were involved in before your
incarceration, and this was not you taking care of any personal finances you had prior
to being incarcerated.

Your complaints about undue pressure by the Warden were unfounded. There is no
indication, other than your claim, that he was involved with the investigation of this
case beyond what the CEO of an institution would normally be. He is, however, fully
within his authority to have his staff pursue disciplinary action. The referral of this
case to the DHO by the UDC is also allowed by policy.

Your compliant of being told that no disciplinary actions would be taken against you if
you cooperated was answered by your witness, Mr. Price. Staff had no idea, at the time,
that they would uncover your connection to the company American Procurement. Mr. Price
clearly stated their investigation was pursuing other suspicions, and they felt you had
information relating to those other issues. Staff could make no promise or commitment
to anything they did not even know existed at that time.

Your complaints about the timing of this incident report were considered, but not found
to interfere with your ability to defend yourself in this matter. You received a copy
of the charge against you at least twenty-four (24) hours prior to your hearing before
the DHO. The fact that Lt. Ruley wrote the original incident report on 05-15-2002, and
then rewrote it on 06-11-2002, did not prevent you from forming and presenting a
defense. Your claim that staff discovered the documents concerning American Procurement
in January of 2002, and should have charged you then, is not necessarily the case. It
is clear from Lt. Ruley's memorandum, that all the investigations which are related to
this case had not even been concluded at the time this incident report was initiated
against you. Lt. Ruley proceeded with disciplinary action when he gathered the
appropriate information to charge you in this case, and that is the point at which he
"became aware of the incident." The fact that some documents were found in January
2002, does not mean that all the necessary information had been gathered. Interviews
had to be conducted, with various people, and apparently the progress of other
investigations related to this case had to be considered before you could be charged.

Your witness Mr. Price answered your questions, but did not present any evidence or
statement which refuted the charge of conducting a business. It seemed that a lot of

DISCIPLINE HEARING OFFICER REPORT                    BP-S305.052 MAY 94
U.S. DEPARTMENT OF JUSTICE                           FEDERAL BUREAU OF PRISONS

your questions for Mr. Price were simply you trying to make a point, rather than
speaking directly to the issue of whether you conducted a business or not.

The basic question here is, did you conduct a business during the times stated? As
stated above, the greater weight of evidence would lead any reasonable person to the
conclusion that you did. All your contentions, and attempts to claim foul play by staff
members, does not change the fact that you gained from your activities related to your
job in UNICOR, and your connection to the company American Procurement. Even the
Invoices used by American Procurement were found on "your" personal directory, and were
created by "you." These Invoices which were on "your" directory also establish the
dates of the incident as stated on the incident report, as all these were dated during
the time frame in which you are charged with conducting a business. Accordingly, it is
the finding of the DHO that you committed the prohibited act as charged.

**VI. SANCTION OR ACTION TAKEN**

Loss of job in UNICOR for the remainder of the current sentence being served with the
Bureau of Prisons

Loss of any and all computer privilege for the remainder of the current sentence being
served with the Bureau of Prisons. This includes any computer, in any area, or any
equipment which operates with a micro processor.

Loss of telephone privilege for three hundred sixty-five (365) days.

**VII. REASON FOR SANCTION OR ACTION TAKEN**

The action/behavior on the part of any inmate to conduct a business poses a serious
threat the orderly operation of the institution. The type of business in this case
causes great concern for the fairness in the letting of government contracts, and the
public perception of the way the government does business. Although this activity was
determined by law enforcement authorities not to be prosecutable, it was prohibited by
policy. It also brings up a question of ethical standards, and inmates taking advantage
of access given them at their work detail. No reasonable thinking person would consider
this to be acceptable. This is established by the fact that the evidence of this
illicit business venture remained hidden, until staff came across it while searching for
other information. If this activity had been considered acceptable, it would not have
been hidden, but would have been revealed and shared with staff supervisors. Part of
your written statement pointed out that you saved UNICOR money with the transactions
between American Procurement and UNICOR. However, you still knew something was wrong
because you never revealed this great money saving venture. The sanctions imposed by
the DHO were taken to let the inmate know that he, and he alone, will be held
responsible for his actions/behavior at all times.

The DHO considered your arguments in mitigation of the sanctions. It is noted that the
sanctions in this case are somewhat stronger than are normally associated with a Low
Moderate severity finding. However, the sanctions in this case were not so much based
on the severity of the charge, but the nature of behavior. Your actions were far beyond
an inmate who charges other inmates for a Laundry Service, or an inmate who hoards large
amounts of commissary items, and resells those items to other inmates at a higher rate.
You profited from government monies by using your knowledge of UNICOR, and taking
advantage of the access given to you by those who were supposed to be supervising you.

The sanctions of Loss of Telephone privilege was specifically taken since the telephone
is a communication devise. Much of what took place was the result of communication by
you to other parties. You chose to communicate with a person in order to make financial
gain from the Federal Government, while you were an inmate at a Federal Institution.
Although you did cooperate once the documentation concerning American Procurement was
discovered, prior to that you did not communicate to your supervisors that you had
helped a man form a company, and that you had received money from that some company, as

**DISCIPLINE HEARING OFFICER REPORT**
**U.S. DEPARTMENT OF JUSTICE**

BP-S305.052 MAY 94
**FEDERAL BUREAU OF PRISONS**

| | | | | | | |
|---|---|---|---|---|---|---|
| a result of that companies dealings with UNICOR. It is felt the loss of this communication devise for a period of time is a sanction would have the desired effect on your future choices in communicating. | | | | | | |
| **VIII. APPEAL RIGHTS:** The inmate has been advised of the findings, specific evidence relied on, action and reasons for the action. The inmate has been advised of his right to appeal this action within 20 calendar days under the Administrative Remedy Procedure. A copy of this report has been given to the inmate. | | | | | | |
| | | Yes | XX | No | | |

**IX. DISCIPLINE HEARING OFFICER**

| Printed Name of DHO | Signature of DHO | Date |
|---|---|---|
| Scott Schleder | *[signature]* | 06-21-2002 |
| Report delivered to inmate by: | DATE | TIME |

(This form may be replicated in WP)                    Replaces BP-304(52) of JAN 88

Page 9 of 9

www.Jacksonville.com

The **Georgia Times-Union**

JACKSONVILLE, FL

2001 — 136th Year — Number 00 — 6 sections — 44 Pages

# FBI says inmates swindled prison

## Fake firm allegedly billed jail $137,759

By Teresa Stepzinski
Times-Union staff writer

They probably never would have met outside the walls of the Federal Correctional Institution in Jesup. But behind bars, the inmates became business partners with an outside accomplice in a computer-assisted embezzlement scheme in which they stole $137,759 from the federal prison system, according to an FBI investigation. The money — traced by the FBI to clandestine bank accounts, stock market investments, a prison commissary account and the purchase of a luxury sport utility vehicle — allegedly came from a sophisticated scam that rivals the plot of fictional legal thrillers and even includes a subtle but nonetheless sardonic slap at prison administrators.

Linares and Mays are suspects along with Mays' girlfriend, Tanya Goldbeck, whose last known address was Ohio, according to the FBI investigation into alleged mail fraud, conspiracy, theft of public money and related charges involving the bilking of a prison-operated business called UNICOR.

The case will be presented to a federal grand jury in Savannah for consideration of criminal indictments, authorities said. Prison officials said Linares and Mays remain at the Jesup facility.

According to the FBI, the scam worked like this: The inmates and a cohort outside the prison established a phony Ohio company that then sent bogus invoices to UNICOR in Jesup once the inmate services arrived, one of the inmates could process them for payment, even though no services or materials had been provided. A check would then be sent to the phony company's bank account, which was controlled by the

See SCAM, Page A-9

JESUP — Jose Linares and Marcel Kenyatta Mays had time on their hands. Not to mention dreams of a future life of leisure financed by taxpayer dollars.

---



*Surf's up at Jacksonville Beach*

---

## Fed cuts interest rates by half point

### Trim falls short of investors' hopes

By John M. Berry
The Washington Post

WASHINGTON — The Federal Reserve cut its target for overnight interest rates by a half-percentage point yesterday to give the lagging U.S. economy a boost and perhaps help put a floor under falling stock

FILED
JA 2 6 2006
NCY MAY... WHITTINGTON, CLERK
U.S... TRICT COURT

06 0143 Ex. C

## Scam: Inmate allegedly bought SUV

From Page A-1

outside accomplice.

UNICOR spokesman Ron Doeh-lin said officials "are not at liberty to comment about the ongoing FBI investigation." He referred all questions to the FBI.

UNICOR is a self-sufficient business entity of the U.S. Bureau of Prisons that provides jobs for federal in-

At the 1,115-inmate Jesup prison, one UNICOR facility is a textile factory that makes the cane, possession of a firearm by a convicted felon and possession of a firearm with an obliterated serial number.

Linares was an inmate employee of UNICOR. His job included the handling of billing invoices for textiles. He had access to the approved vendor list, which is necessary on the business end of the prison, according to an affidavit.

The FBI said that Mays told investigators he had formed TYBY with Goldbeck last fall. He said Linares then gov. TYBY with Goldbeck last fall. He said Linares then gov. TYBY

investigators.

FBI Special Agent Mark Alig, in sworn affidavits seeking warrants to seize the money, detailed the scheme as explained by Linares, Mays and Goldbeck under questioning.

A former Boston-area cop, Linares, 34, is beginning the third year of a 10-year stretch for bank robbery and use of a firearm, according to federal prison records.

Mays, also 34, is in his seventh year of a 19-year-plus term for bank robbery and use of a firearm, according to federal prison records.

Mays agents they would share any related investments, and Goldbeck would receive a portion of that money.

Alig's affidavit said Mays told him at least $10,000 of the $45,000 deposited in his Tampa bank account was money in-vested in stocks and options.

According to the FBI,

## Gun: Police may charge 12-year-old's guardians

From Page A-1

gun to show classmates. There is no education whether or harm anyone with the weapon, police said.

"It might just be a stupid act, have called the school and have been a darker intention," Aspinwall said.

The youth, who authorities will not identify because of his age, could be sentenced to five years if found guilty and given the maximum penalty, Aspinwall said.

Prison officials on March 7 told Alig that Linares' commissary account.

Dan Dunne, prison system spokesman in Washington, D.C., said procedures in place to detect and thwart crim-inal activity by inmates. Prison officials also review procedures for when such incidents occur, he said.

"You... have individuals sent to prison for violating laws while out in the community. When they come into prison, some will continue in their attempts to commit crimes," Dunne said.

charges against the youth's guardians.

"The parents are responsible for their children, particularly the children are juveniles," Gillette said.

Davis said concerned parents have called the school and ministrative headquarters asking about the role of the youth's parents for storing the gun in a place accessible by child.

Valerie Ackerman, president of the school's PTA, said she was shock to learn about incident.

"I want to praise the child came forward," Ackerman said. "To me that child saved yesterday."

Ackerman said school officials sent letters home with school's 639 pupils Tuesday, giving details about the student and also talked about the dangers bringing weapons to school.

Kingsland Police Chief Dayton Gillette said his agency is still investigating is considering

# GEORGIA

**The Times-Union**

Saturday, November 10, 2001

**B**

# Indictment: Inmates bilk prison

## Phony firm set up from behind bars

By Teresa Stepzinski
· Times-Union staff writer

SAVANNAH — Two federal prison inmates yesterday were indicted on multiple charges that they bilked the government out of more than $137,000 via a behind-bars embezzlement scheme this year.

Jose Linares and Marcel Kenyatta were federal prisoners at the time, it was a fairly sophisticated embezzlement scheme, said FBI Special Agent Tony Alig, lead investigator in the case. "They understood the prison Correctional Institution in Jesup, when the scam occurred, prison records show.

Mays and Linares are accused of devising and carrying out a computer-assisted fraud scheme with the assistance of unindicted and unnamed accomplices on the outside. They created a phony company that automated bogus supply invoices to a prison-operated business called UNICOR, according to the indictment and related court documents.

"Considering these two individuals system, knew how the invoices were processed and paid, and had a stolen computer password to access those accounts."

The FBI traced the embezzled money to clandestine bank accounts, stock market investments and prison commissary accounts, court documents show.

"Unfortunately, we were only able to recover about half of the stolen money. The rest was spent and not recoverable," Alig said.

Alig said authorities don't anticipate any additional arrests in the case.

UNICOR is a self-sufficient business entity of the U.S. Bureau of Prisons that provides job opportunities for federal inmates nationwide.

At the Jesup prison, the UNICOR facility is a textile factory that makes uniforms primarily used by the military. The factory employs about 400 inmates who are supervised by 19 prison staff members, court documents show.

The FBI investigation began March 5 after prison officials detected the corporate fraud while reviewing computer files for UNICOR contracts and related invoices for supplies purchased from TDSY Textiles Inc. [?], based in Shaker Heights, Ohio.

Alig said TDSY was created by Mays and Linares with the assistance

See CRIME, Page B-3



# Crime: Prison computer used to send

From Page B-1

Before his conviction, Mays worked in a Detroit clothing business, Affgali showed.

Aug. said Linares and Mays became friends when Linares was a student in a business class being taught by Mays inside the prison.

Aug., in swcrn affidavits seeking warrant to seize the stolen money, detailed the embezzlement scheme. The scam evolved and worked as follows:

Linares was an inmate employee of UNICOR. His job involved filing, billing handling, supplies bought by the factory from outside companies. He had access to the UNICOR computer system via bank robbery and use of a fire-arm during the commission of a crime, prison and court records show. Mays, also 34, is a former Boston-area police officer, currently serving a 10-year term for conspiracy to distribute cocaine, possession of a firearm by a convicted felon and possession of a firearm with an obliterated serial number, the records show.

UNICOR and the prison, the and the woman's document affidavits showed. No indictment has showed.

The woman served as owner, been issued against the woman of TVBY Textiles. She billed an, who authorities said has plies that purportedly had been cooperating, in the shipped to the prison factory. investigation.

No goods or materials were shipped to UNICOR from "conspiracy" to despoil the company, according to the United States with respect to affidavits.

Linares, at UNICOR, routed the bogus invoices so that three claims to a government agency bills were paid by the prison. At presenting false or fictitious Mays' direction, the woman depleted the UNICOR pay-account. Checks from the TVBY bank for the embezzled account, then were sent to addresses in Linares' name in Arizona and Massachusetts, as money, then were sent to well as to a man also in punishable by up to a five-year Massachusetts.

The stolen money as well as any profits from the stock mar-ket investments were to be divided among Mays, Linares authorities said.

Each conspiracy and theft charge is punishable by up to 10 years in prison. The fraud term. Each charge also is pun-ishable by up to a maximum fine of $250,000, according to federal law.

No arraignment date has been set for the case.

## THURSDAY

**Film discussion** — Features Andrew Gordon of the University of Florida-Gainesville on Visions of the Future in American Science Fiction Films of the 1950s. St. Natural Free. Information: (912) 462-5454.

Support group meeting — National Alliance for the Mentally Ill, 7 p.m., Greenleaf Center, 7730 Fineview Drive. Information (912) 245-7674.

Support group meeting — First Christian Church, Alden Mays.

Basketball — Coastal Georgia Community College vs. St. Johns Community College, 7:30 p.m.

## [TABLE 4 (Cont'd)]

to present a statement orally or in writing.  The DHO shall document its action on, or by an attachment to, the initial Institution Discipline report.  If further withholding is ordered, the DHO shall advise the inmate of the inmate's right to appeal through the Administrative Remedy procedures (Part 542).

Only the Warden may restore withheld statutory good time.  This decision may not be delegated lower than the Associate Warden level.  Restoration eligibility is based on the severity scale.  (See Table 6)]

An application for restoration of good time must be forwarded from the inmate's unit team, through both the DHO and Captain for comments, to the Warden or his or her delegated representative for final decision.

Part 542 refers to Program Statement on Administrative Remedy Procedure for Inmates.  See Page 20 of this Chapter for information on restoration eligibility.

This sanction F does not apply to inmates committed under the provisions of the Comprehensive Crime Control Act.  This means that inmates who committed their crimes on or after November 1, 1987, and who are sentenced under the Sentencing Reform Act provisions of the Comprehensive Crime Control Act are only eligible to receive 54 days good conduct time credit (18 U.S.C. § 3624(b)).  This credit is given at the end of each year of time served and, once given, is vested.  For these inmates, the DHO's authority is final and is subject only to review by the Warden to ensure conformity with the provisions of the discipline policy and by inmate appeal through the Administrative Remedy procedures.

[2.  Sanctions of the Discipline Hearing Officer/Unit Discipline Committee: (upon finding the inmate committed the prohibited act)

G. Loss of Privileges:]  Commissary, Movies, Recreation, etc.  [The DHO or UDC may direct that an inmate forego specific privileges for a specified period of time.  Ordinarily, loss of privileges is used as a sanction in response to an abuse of that privilege.  However, the DHO or UDC may impose a loss of privilege sanction not directly related to the offense when there is a lack of other appropriate sanctions or when imposition of an appropriate sanction previously has been ineffective.]

**06 0143**

After careful consideration of all relevant facts, the UDC or DHO may impose a loss of privilege sanction not directly related to the offense, provided there is a belief that the imposed sanction (e.g., loss of visiting privileges) is viewed as having a significant impact on the inmate's future behavior.

**FILED**

JAN 2 6 2006

NANCY MAYER WHITTINGTON, CLI
U.S. DISTRICT COURT

Ex. D

PS 5270.07
CN-08 Issued 9/29/97 Effective 11/3/97
Chapter 4, Page 21

Loss of recreation privileges cannot be imposed on inmates in Special Housing, but may be used as a sanction for general population inmates.

[H. Change Housing (Quarters). The DHO or UDC may direct that an inmate be removed from current housing and placed in other housing.

I. Remove from Program and/or Group Activity. The DHO or UDC may direct that an inmate forego participating in any program or group activity for a specified period of time.

J. Loss of Job. The DHO or UDC may direct that an inmate be removed from present job and/or be assigned to another job.

K. Impound Inmate's Personal Property. The DHO or UDC may direct that an inmate's personal property be stored in the institution (when relevant to offense) for a specified period of time.

L. Confiscate Contraband. The DHO or UDC may direct that any contraband in the possession of an inmate be confiscated and disposed of appropriately.]

For procedures, see the Program Statement on Personal Property of Inmates.

[M. Restrict Quarters. The DHO or UDC may direct that an inmate be confined to quarters or in its immediate area for a specified period of time.

N. Extra Duty. The DHO or UDC may direct that an inmate perform tasks other than those performed during regularly assigned institutional job.

O. Reprimand. The DHO or UDC may reprimand an inmate either verbally or in writing.

P. Warning. The DHO or UDC may verbally warn an inmate regarding committing prohibited act(s).]

Note: Although not considered sanctions, the UDC or DHO may recommend classification or program changes. For example, the DHO may recommend an inmate's participation in, or removal from, a particular program. When this occurs, a final decision will ordinarily be made in accordance with the established procedures for deciding that issue. In the example cited above, a referral would be made to the inmate's unit team for a decision on the recommendation.

REG NO..: 14101-057 NAME....: MCGLAMRY, DARRYL JAMES
CATEGORY: WRK      FUNCTION: DIS       FORMAT:

| FCL | ASSIGNMENT | DESCRIPTION | START DATE/TIME | STOP DATE/TIME |
|-----|------------|-------------|-----------------|----------------|
| TDG | A&O | A&O PROGRAM   EX. 209 | 06-24-2002 0818 | 07-16-2002 1449 |
| ATL | DCU UNASSG | DETENTION CENTER UNASSIGNED | 06-19-2002 1313 | 06-24-2002 0648 |
| TAL | JAIL | WORK ASSG (A-PRE/A-HLD) | 06-14-2002 1423 | 06-19-2002 0435 |
| JES | SHU | SPECIAL HOUSING UNIT | 12-10-2001 1527 | 06-14-2002 1045 |
| JES | PIPEFITING | MAINTENANCE 4 DETAIL | 11-29-2001 0001 | 12-10-2001 1527 |
| JES | CMS | CMS CLERK | 11-27-2001 0001 | 11-29-2001 0001 |
| JES | AM FOOD | FOOD SVC AM SHIFT | 11-20-2001 0001 | 11-27-2001 0001 |
| JES | UNASSG | UNASSIGNED | 10-31-2001 1310 | 11-20-2001 0001 |
| JES | SHU | SPECIAL HOUSING UNIT | 10-19-2001 1438 | 10-31-2001 1310 |
| JES | UNICOR 1 | UNICOR | 07-12-2001 0001 | 10-19-2001 1438 |
| JES | PIPEFITING | MAINTENANCE 4 DETAIL | 04-12-2001 0001 | 07-12-2001 0001 |
| JES | A&O | ADMISSION & ORIENTATION PGM | 04-02-2001 1258 | 04-12-2001 0001 |
| JES | SHU | SPECIAL HOUSING UNIT | 02-21-2001 1337 | 04-02-2001 1258 |
| JES | UNICOR 1 | UNICOR | 04-15-2000 1232 | 02-21-2001 1337 |

G0002        MORE PAGES TO FOLLOW . . .

06 0143

FILED

JAN 2 6 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Ex. E

```
 TDGQV           *           INMATE DISCIPLINE DATA            *     01-07-2003
PAGE 001 OF 001 *      CHRONOLOGICAL DISCIPLINARY RECORD       *     08:22:58

REGISTER NO: 14101-057 NAME..: MCGLAMRY, DARRYL JAMES
FUNCTION...: PRT      FORMAT: CHRONO    LIMIT TO    MOS PRIOR TO 01-07-2003

-------------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 992221 - SANCTIONED   INCIDENT DATE/TIME: 12-10-2001 1400
DHO HEARING DATE/TIME: 06-13-2002 1413
FACL/CHAIRPERSON.....: JES/SCHLEDER S
APPEAL CASE NUMBER(S): 277735
REPORT REMARKS.......: DENIED CHARGE.  CONDUCTED OUTSIDE BUSINESS WHICH PROVIDE
                       GOODS TO UNICOR, WHILE WORKING FOR UNICOR ON INMATE DETAI
   408   CONDUCTING A BUSINESS W/O AUTH - FREQ: 1
         LOSE JOB    / CS
         COMP:  LAW:   LOSS OF JOB IN UNICOR FOR REMAINDER OF SENTENCE.
                       NO EMPLOYMENT WITH UNICOR ALLOWED IN ANY FASHION
         LP OTHER   / 12 YEARS / CS
         COMP:  LAW:   LOSS OF COMPUTER PRIVILEGE REMAINDER OF SENTENECE
                       NO ACCESS TO ANY COMPUTERS, OR MICRO PROCESSORS
         LP PHONE   / 365 DAYS / CS
         COMP:  LAW:   LOSS OF TELEPHONE PRIVILEGE FOR 365 DAYS
                       THROUGH 06-12-2003
```

06 0143

G0005      TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED

**FILED**

JAN 2 6 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Ex. F





UNITED STATES GOVERNMENT

# MEMORANDUM

FEDERAL CORRECTIONAL INSTITUTION
JESUP, GEORGIA 31545

DATE:    June 14, 2002

REPLY TO
ATTN OF:    Scott A. Schleder, Discipline Hearing Officer

SUBJECT:    LOSS OF JOB

RE:    McGlamry, Darryl    REG. NO. 14101-057    IR# 992221

TO:    C Unit Team

As a result of a finding by the Discipline Hearing Officer, the above named inmate was
determined to have committed the prohibited act code 408. Sanction(s) imposed included a loss
of job assignment in UNICOR. Base on the nature of this incident, inmate McGlamry should
never be employed by UNICOR in any fashion for the remainder this sentence.

Appropriate change in job assignment should be made by Unit Staff.

cc:    Central File
       D.H.O.

06 0143

FILED

JAN 2 6 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Ex. G



UNITED STATES GOVERNMENT

# MEMORANDUM

FEDERAL CORRECTIONAL INSTITUTION
JESUP, GEORGIA 31545

DATE:    June 14, 2002

REPLY TO
ATTN OF:    Scott A. Schleder, Discipline Hearing Officer

SUBJECT:    RESTRICTED TELEPHONE PRIVILEGE

RE:    McGlamry, Darryl    REG. NO. 14101-057    IR# 992221

TO:    Inmate Telephone System Accounting Technician

As a result of a finding by the Discipline Hearing Officer, the above named inmate was
determined to have committed the prohibited act code 408. Sanction(s) imposed included the
loss of telephone privilege.

The loss of this privilege is to include the dates from 06-13-2002 through 06-12-2003.

cc:    Central File
D.H.O.

06 0143

# FILED

JAN 2 6 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Ex. H